**Claudia Navarro PINEDA, et al., Plaintiffs,**

v.

**CITY OF HOUSTON, et al., Defendants.**

**No. CIV. A. H–98–3877.**

United States District Court, S.D. Texas, Houston Division.

Dec. 6, 2000.

Richard Warren Mithoff, Jr., Mithoff and Jacks, Houston, TX, Paul Constance Nugent, Foreman Degeurin et al., Houston, TX, Julian Fertitta, III, Grimes & Fertitta, Houston, TX, Roger Townsend, Hogan Dubose et al., Houston, TX, for plaintiffs.

Robert Louis Cambrice, City of Houston Legal Dept., Houston, TX, for City of Houston.

Fred A. Keys, Jr., Houston, TX, Robert Anthony Armbruster, Houston, TX, for D.H. Strouse.

Robert J Thomas, Houston, TX, for D.R. Berrera, P.A. Herrada, L.E. Tillery, James R. Willis.

Duncan Neblett, III, Houston, TX, for D.R. Perkins.

## OPINION AND ORDER

LAKE, District Judge.

Pending before the court is the City of Houston's Motion for Summary Judgment (Docket Entry No. 180). The City argues that it is entitled to summary judgment on the claims plaintiffs have brought pursuant to 42 U.S.C. § 1983 [1] and § 1988. For the reasons set forth below the City's motion will be granted.

### I. Background

#### A. Factual

Until the early 1990s responsibility for narcotics enforcement in the Houston Police Department (HPD) resided primarily with the local patrol divisions whose tactical units conducted undercover narcotics investigations. In 1992 Sam Nuchia became HPD Chief.[2] Nuchia ordered the tactical units to remain in uniform and to stop conducting undercover narcotics investigations, which were consolidated in a specialized Narcotics Division.[3]

In high crime areas Nuchia implemented "zero tolerance," a strategy in which communities are saturated by uniformed officers who enforce every law without regard to the magnitude of the offense.[4] Nuchia approved use of zero tolerance in the Gulfton area to combat street-level narcotics dealing.[5] Nuchia also created the Gang Task Force (GTF), an overtime program dedicated to suppressing gang activity through high visibility and aggressive enforcement of all laws.[6] The GTF is composed of uniformed patrol officers assigned to regular patrol shifts who also work overtime shifts with the GTF.[7] In the Gulfton area, the Southwest GTF was ordered to suppress gang activity using the zero-tolerance strategy.[8]

On the night of July 11, 1998, two officers assigned to the Southwest GTF, P.A. Herrada and J.R. Willis, stopped a car for traffic violations. Herrada and Willis arrested a passenger, Ryan Baxter, for public intoxication and for giving alcohol to a minor. When Baxter offered to provide information about a crack cocaine dealer,

---

1. City of Houston's Motion for Summary Judgment at p. 1 (Docket Entry No. 180).

2. Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 3 (Docket Entry No. 195). See also Deposition of former HPD Chief Sam Nuchia at p. 68 attached in Vol. II of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

3. *Id.* at pp. 3–4. See also Deposition of HPD Chief Clarence Bradford at pp. 172–176; and Nuchia Deposition at pp. 69–72 attached in Vol. II of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

4. *Id.* at p. 4. See also Nuchia Deposition at pp. 49–64, 71–72.

5. *Id.* at pp. 4 and 11. See also Nuchia Deposition at pp. 75–76.

6. *Id.* at p. 4. See also Nuchia Deposition at pp. 30–32.

7. *Id.* See also Nuchia Deposition at pp. 31–32.

8. *Id.* at p. 5. See also Nuchia Deposition at p. 49.

Herrada and Willis contacted other members of their unit. Together with officers D.R. Barrera, D.R. Perkins, L.E. Tillery, and the GTF supervisor, Sergeant D.H. Strouse, Herrada and Willis went with Baxter to the apartment occupied by Rogelio Oregon Navarro, Salvador Lopez, Nelly Mejia, and Pedro Oregon Navarro. While Baxter knocked on the door, the officers waited in a column at the foot of the stairs. Once the door opened, the officers entered the apartment without a warrant and without consent from the occupants. Following the entry, Navarro was shot dead and the three other occupants of the apartment were arrested. A subsequent search of the apartment failed to find drugs, but did find a handgun close to Navarro's body.

## B. Procedural

On November 17, 1998, Pedro Oregon Navarro's mother-Claudia Navarro Pineda, his sister-Susana Oregon Navarro, who has been appointed administratrix of his estate, and the mothers of his two children-Ana Isabel Lores as next friend of Ashley Oregon–Lores and Blanca Lidia Viera as next friend of Belinda Marili Viera filed this action together with the surviving occupants of the apartment, Rogelio Oregon Navarro, Salvador Lopez, and Nelly Mejia, against the City of Houston and HPD officers Herrada, Willis, Barrera, Perkins, Tillery, and Strouse pursuant to 42 U.S.C. § 1983 and the Texas Wrongful Death Statute, Texas Civil Practice and Remedies Code §§ 71.001 *et seq.* Plaintiffs alleged that without a warrant or probable cause the officers forcibly entered the apartment occupied by Pedro Oregon Navarro, Rogelio Oregon Navarro, Salvador Lopez, and Nelly Mejia and used excessive force to seize the occupants of the apartment in violation of rights guaranteed by the Fourth and Fourteenth Amendments. Specifically, plaintiffs alleged that when Rogelio Oregon Navarro opened the door to the apartment from the inside, the defendant officers rushed in without a search warrant and without stop-ping to request consent. Plaintiffs alleged that once inside, the officers threatened, assaulted, and falsely arrested Rogelio Oregon Navarro, Salvador Lopez, and Nelly Mejia, and shot and killed Pedro Oregon Navarro. Plaintiffs alleged that the officers' wrongful acts were conducted pursuant to official policies or customs of the City.

On April 7, 1999, Barrera, Herrada, Tillery, and Willis filed a motion for partial summary judgment on claims arising from the death of Pedro Oregon Navarro based on qualified immunity (Docket Entry No. 46). On April 8, 1999, Barrera, Herrada, Tillery, and Willis filed a motion to dismiss the § 1983 claims asserted by Rogelio Oregon Navarro, Salvador Lopez, and Nelly Mejia based on qualified immunity (Docket Entry No. 47); Strouse filed a motion to dismiss (Docket Entry No. 48) and a motion for summary judgment (Docket Entry No. 50); and Perkins filed a motion for summary judgment (Docket Entry No. 49). In an Opinion and Order entered on July 29, 1999 (Docket Entry No. 72), the court granted in part and denied in part the officers' motions and ordered plaintiffs to file a second amended complaint. In the court's Opinion and Order of July 29, 1999, the motion for partial summary judgment on plaintiffs' claims for wrongful death and excessive use of force against Pedro Oregon Navarro was granted as to Tillery and Willis and denied as to Barrera and Herrada; the motion of Barrera, Herrada, Tillery, and Willis to dismiss plaintiffs' § 1983 claims was denied as to plaintiffs' claims against all four officers for the wrongful entry and search of Rogelio Oregon Navarro's apartment; denied as to plaintiffs' claims against Herrada for the false arrests of Salvador Lopez, Rogelio Oregon Navarro, and Nelly Mejia; denied as to plaintiffs' claims against Willis for the false arrests of Salvador Lopez and Rogelio Oregon Navarro and excessive use of force against Rogelio Oregon Navarro; denied as to plaintiffs' claims against Barrera for the false arrest of Nelly Mejia; granted as

to plaintiffs' claims against Herrada for excessive use of force against Salvador Lopez, Rogelio Oregon Navarro, and Nelly Mejia; granted as to plaintiffs' claims against Willis for the false arrest of Nelly Mejia and excessive use of force against Salvador Lopez and Nelly Mejia; granted as to plaintiffs' claims against Barrera for the false arrests of Salvador Lopez and Rogelio Oregon Navarro and excessive use of force against Salvador Lopez, Rogelio Oregon Navarro, and Nelly Mejia; and granted as to plaintiffs' claims against Tillery for false arrests and excessive use of force against Salvador Lopez, Rogelio Oregon Navarro, and Nelly Mejia. Perkins' motion for summary judgment was denied as to plaintiffs' claims for the warrantless entry and search of Rogelio Oregon Navarro's apartment and the false arrests of Salvador Lopez and Nelly Mejia; granted as to plaintiffs' claims for the false arrest of Rogelio Oregon Navarro and excessive use of force against Salvador Lopez, Rogelio Oregon Navarro, Nelly Mejia, and Pedro Oregon Navarro; and granted as to plaintiffs' claims for the wrongful death of Pedro Oregon Navarro. Strouse's motion to dismiss was denied as to plaintiffs' claims for the wrongful entry and search of Rogelio Oregon Navarro's apartment and the false arrest of Nelly Mejia; granted as to plaintiffs' claims for the false arrests of Salvador Lopez and Rogelio Oregon Navarro and for excessive use of force against Salvador Lopez, Rogelio Oregon Navarro, Nelly Mejia, and Pedro Oregon Navarro; and granted as to plaintiffs' claims for the wrongful death of Pedro Oregon Navarro. Strouse's motion for summary judgment was denied.[9]

On August 9, 1999, plaintiffs filed their Second Amended Complaint (Docket Entry No. 76). On August 23, 1999, the City of Houston filed crossclaims against the officers (Docket Entry No. 84), and the officers filed crossclaims against the City (Docket Entry No. 85).

On August 24, 1999, defendants Barrera, Herrada, and Willis filed their Notice of Interlocutory Appeal of the court's partial denial of their dispositive motions (Docket Entry No. 86). On August 27, 1999, Strouse filed his Notice of Interlocutory Appeal of the court's partial denial of his dispositive motions (Docket Entry No. 92). By Order entered on March 16, 2000, the Fifth Circuit dismissed Strouse's appeal (Docket Entry No. 159); and by Order entered on March 21, 2000, the Fifth Circuit dismissed Willis's appeal (Docket Entry No. 160). The appeals filed by Barrera and Herrada are pending before the Fifth Circuit.

On October 13, 1999, plaintiffs Rogelio Oregon Navarro, Salvador Lopez, and Nelly Mejia filed a Motion for Voluntary Dismissal Without Prejudice (Docket Entry No. 120). At a hearing held on October 27, 1999, the court granted the Motion for Voluntary Dismissal Without Prejudice and dismissed all claims brought by Rogelio Oregon Navarro, Salvador Lopez, and Nelly Mejia (Docket Entry No. 127). On August 4, 2000, the City filed motions for

9. The claims asserted against the officers that survived the court's Opinion and Order of July 29, 1999, are shown in Table 1.

| DEFENDANT | SEARCH | SALVADOR LOPEZ Arrest | SALVADOR LOPEZ Force | ROGELIO NAVARRO Arrest | ROGELIO NAVARRO Force | NELLY MEJIA Arrest | NELLY MEJIA Force | PEDRO NAVARRO Force | PEDRO NAVARRO Wrongful Death |
|---|---|---|---|---|---|---|---|---|---|
| Herrada | ✓ | | ✓ | | ✓ | | ✓ | ✓ | ✓ |
| Willis | ✓ | ✓ | | ✓ | ✓ | | | | |
| Barrera | ✓ | | | | | ✓ | | ✓ | ✓ |
| Tillery | ✓ | | | | | | | | |
| Perkins | ✓ | ✓ | | | | ✓ | | | |
| Strouse | ✓ | | | | | ✓ | | | |

TABLE 1: Plaintiffs' § 1983 Claims Surviving Original Motion Review

summary judgment on the claims that plaintiffs have brought pursuant to 42 U.S.C. § 1983 and § 1988 (Docket Entry No. 180) and on the claims asserted by the officers (Docket Entry No. 181). By Order entered on September 29, 2000, the court denied the City's motion for summary judgment on the crossclaims alleged by the officers (Docket Entry No. 201).

Pending before the court is the City of Houston's Motion for Summary Judgment (Docket Entry No. 180) in which the City seeks summary judgment on the claims that plaintiffs have brought for violation of the civil rights of Pedro Oregon Navarro pursuant to 42 U.S.C. § 1983 and § 1988.[10] The City argues that it is entitled to summary judgment on these claims "because the undisputed evidence shows that as a matter of law, the City of Houston does not have a custom, policy, or practice which was the moving force behind the alleged violation of the rights of Pedro Oregon Navarro." [11]

## II. *Summary Judgment Standard*

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed.R.Civ.P. 56(c). Facts are considered "material" if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact creates a "genuine issue" if the evidence is such that the trier of fact reasonably could resolve the factual dispute in favor of either party. *Id.* at 2511. The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party moving for summary judgment bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Id.*

If the party moving for summary judgment meets the initial burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports that party's claim. *See Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). Unsupported allegations or affidavit or deposition testimony asserting ultimate or conclusory facts and conclusions of law are not sufficient to defeat a motion for summary judgment. *Clark v. America's Favorite Chicken Co.,* 110 F.3d 295, 297 (5th Cir. 1997). *See also Anderson,* 106 S.Ct. at 2509–2510. Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little,* 37 F.3d at 1075. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine is-

---

**10.** City of Houston's Motion for Summary Judgment at p. 2 (Docket Entry No. 180).

**11.** *Id.*

sue for trial. *Anderson*, 106 S.Ct. at 2511.

### III. *Legal Standard*

■ 42 U.S.C. § 1983 provides a private right of action against "[e]very person" acting under color of state law who imposes or causes to be imposed a deprivation of constitutional rights. *Owen v. City of Independence, Missouri*, 445 U.S. 622, 100 S.Ct. 1398, 1423, 63 L.Ed.2d 673 (1980). *See also Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 2035–2036, 56 L.Ed.2d 611 (1978). To establish a § 1983 claim against the City, plaintiffs must identify "(1) a policy (2) of the city's policymaker (3) that caused (4) the plaintiff[s] to be subjected to a deprivation of [a] constitutional right." *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 168 (5th Cir.1985), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987), *citing Monell*, 98 S.Ct. at 2036–2037. *See also Brown v. Bryan County, Ok.*, 219 F.3d 450, 457 (5th Cir.2000).

### A. Policy

■ That the legal meaning of the term "policy" encompasses a range of municipal behavior can be found in *Monell*. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible."

*Brown*, 219 F.3d at 457 n. 9, *quoting Monell*, 98 S.Ct. at 2036–2037. Official policy, for purposes of § 1983 liability, is "[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Id.* at p. 457, *quoting Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir.1984) (en banc), *cert. denied*, 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). Official policy can also be "[a]

persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id., quoting Bennett*, 735 F.2d at 862. *See also Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.) (en banc) (adopting definition of "official policy"), *modified on other grounds on reh'g*, 739 F.2d 993 (5th Cir. 1984) (en banc).

### B. Of City's Policymaker

■ A city cannot be held vicariously liable under § 1983 for the constitutional torts of its employees or agents. *See Monell*, 98 S.Ct. at 2036–2037. *See also Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996). Instead,

[t]he 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"—that is, acts which the municipality has officially sanctioned or ordered.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). "A policy or custom becomes official for purposes of § 1983 when it results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy." *Gros v. City of Grand Prairie, Tex.*, 181 F.3d 613, 615 (5th Cir.1999).

### C. Causation

■ Liability cannot be imposed on a municipality unless deliberate action attributable to the municipality itself is the "moving force" behind the deprivation of the plaintiff's federal rights. *Board of County Com'rs of Bryan County, Okla. v.*

*Brown*, 520 U.S. 397, 117 S.Ct. 1382, 1386, 137 L.Ed.2d 626 (1997), *quoting Monell*, 98 S.Ct. at 2027. *See also Spiller v. City of Texas City Police Dept.*, 130 F.3d 162, 167 (5th Cir.1997) (official policy or custom must have been "a cause in fact of the deprivation of rights inflicted"). To satisfy the moving force requirement, plaintiffs must establish either that the custom or policy was the cause in fact of the constitutional violation or that the constitutional violation resulted from the execution of the official policy or custom. *Spiller*, 130 F.3d at 167, *quoting Meadowbriar Home For Children, Inc. v. Gunn*, 81 F.3d 521, 533 (5th Cir.1996), and *Fraire v. City of Arlington*, 957 F.2d 1268, 1277 (5th Cir.), *cert. denied*, 506 U.S. 973, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992).

■ Plaintiffs "must [also] demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Bryan County*, 117 S.Ct. at 1390. " 'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 1391. *See also Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir.2000) ("Deliberate indifference is more than mere negligence."); *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir.1998) ("*Bryan County* underscores the need for *Monell* plaintiffs to establish both the causal link ('moving force') and the city's degree of culpability ('deliberate indifference' to federally protected rights)."). "These requirements must not be diluted, for '[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.' " *Snyder*, 142 F.3d at 796, *quoting*

*Bryan County*, 117 S.Ct. at 1394. *See Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)(defining "deliberate indifference").

**D. Deprivation of Constitutional Right**

■ "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights conferred elsewhere.' " *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), *quoting Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979). Plaintiffs must therefore show that the acts complained of occurred under color of state law and that Pedro Oregon Navarro was deprived of a right guaranteed by the Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). *See also Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th Cir.1995).

**IV. *Plaintiffs' Arguments***

Plaintiffs argue that the actions of the Houston police officers who entered the Navarro apartment resulted from the following official policies or customs of HPD:

(1) allowing gang task forces to conduct unconstitutional searches of private residences in violation of the Fourth Amendment;

(2) providing inadequate training and supervision to the gang task forces; [and]

(3) directing the gang task forces to conduct law enforcement activities in a racially discriminatory manner.[12]

---

**12.** Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 1 (Docket Entry No. 195). Although plaintiffs' First Amended Complaint also asserted claims for inadequate recruitment and economic discrimination, "[a]fter conducting extensive discovery and reviewing the legal bas-

es for their claims, Plaintiffs have concluded the evidence will not support claims for inadequate recruitment or economic discrimination, and they are abandoning those claims." Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 2 (Docket Entry No. 195).

The City argues that it is entitled to summary judgment because the City does not have a custom, policy, or practice that was the moving force of a violation of Pedro Oregon Navarro's civil rights. Plaintiffs argue that the court should deny the City's motion because the summary judgment record raises genuine questions of material fact.

### A. Allowing GTFs to Conduct Unconstitutional Searches of Private Residences in Violation of the Fourth Amendment

■ Plaintiffs allege that HPD maintained an unwritten policy of allowing its GTF officers to conduct unconstitutional searches of private residences in support of its zero-tolerance strategy and that the execution of this policy caused the warrantless entry and search of the Navarro apartment and the shooting death of Pedro Oregon Navarro in violation of the Fourth Amendment.[13]

#### 1. *Policy Based on Pattern of Misconduct*

Plaintiffs argue that their experts "have identified several warrantless residence searches that represent a pattern of constitutional violations."[14] The City argues that plaintiffs cannot show that it had an unwritten policy of allowing GTF officers to conduct unconstitutional searches of private residences.[15]

#### (a) Plaintiffs' Evidence

As evidence that HPD has an unwritten policy allowing unconstitutional searches of private residences, plaintiffs submit the affidavit testimony of expert witnesses, Thomas A. Parker and James Fyfe, 73 HPD offense reports, and a statement made by officer Barrera following the Pedro Oregon Navarro shooting.

#### (i) Expert Witness Testimony

Parker testified that the City produced approximately 5,000 offense reports.[16] Parker testified that when he asked plaintiffs' lawyers to cull from the 5,000 offense reports those involving narcotics and searches and seizures conducted by members of the Southwest GTF,[17] he received approximately 493 reports spanning the period from November 6, 1993, to December 29, 1999.[18] Parker testified that approximately 428 of these offense reports "involved narcotics investigations of one form or another."[19] Among these, approximately 237 investigations involved automobiles, ... approximately 224 investigations involved pedestrians, ... and approximately 33 investigations involved residences or other occupied dwellings such as motels.[20] When he narrowed his review

> to a one year period immediately preceding the Pedro Oregon shooting ... [Parker] found that there were approximately 14 incidents of GTF members making warrantless investigative intrusions into residential premises pursuant to narcotics investigations—approximately one such intrusion every four weeks.[21]

From his review of these 14 offense reports Parker concluded that

**13.** *Id.* at p. 22.

**14.** *Id.* at p. 24.

**15.** City of Houston's Motion for Summary Judgment at p. 37 (Docket Entry No. 180).

**16.** Parker Affidavit at p. 32. Although Parker refers to these reports as "Current Information Reports," two of the three "Current Information Reports" that he summarized at pages 29–32 of his affidavit include incident numbers that coincide with offense reports summarized by Fyfe and attached as Exhibits

7 and 19 in Vol. III of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**17.** *Id.*

**18.** *Id.*

**19.** *Id.* at p. 33.

**20.** *Id.*

**21.** *Id.* at pp. 33–34.

[t]he warrantless investigative intrusions into private residences, even though relatively small in number, were so egregious and outside the training and responsibilities of the GTF officers, that they should have been clear warnings to the Houston Police Department supervisory and management staff that a significant problem existed in GTF tactics.[22] Like Parker, Fyfe reviewed close to 500 incident reports from which he concluded that "[t]he data ... disclose a pattern in which Southwest Gang Task Force officers have conducted what are clearly narcotics investigations involving apparently improper entries into private homes, apartments, or motel rooms...."[23] Fyfe supported his conclusion by summarizing 17 incidents referenced by Bates Number.[24]

### (ii) Offense Reports

Plaintiffs submit 73 offense reports ranging in date from March 18, 1994, to December 10, 1999.[25] Although plaintiffs' expert witnesses testify that they each reviewed close to 500 offense reports, plaintiffs fail to discuss the offense reports individually and instead generally reference 6 of the 73 offense reports included in the summary judgment record in support of their experts' testimony.[26] Plaintiffs assert that these six offense reports establish that "[t]he pattern [of constitutional violations] became especially evident in the months leading up to the Oregon shooting, when there was a marked escalation in the number of warrantless residential searches."[27]

### (iii) Officer Barrera's Statement

After the Pedro Oregon Navarro shooting officer Barrera executed a written statement in response to a complaint filed by HPD Chief Clarence Bradford.[28] In it Barrera stated that "[o]n a prior occasion, myself and several other officers of the Gang Task Force had entered other residences looking for drugs."[29] Plaintiffs argue that officer Barrera's statement confirms the existence of a pattern of warrantless searches that was "entrenched—and accelerating."[30]

### (b) The City's Evidence

The City argues that plaintiffs' evidence fails to establish that HPD has an unwritten policy allowing unconstitutional searches of private residences because "several of the cited reports are duplicates

---

**22.** *Id.* at p. 36.

**23.** Fyfe Affidavit at pp. 22 and 26.

**24.** *Id.* at pp. 27–30. Although Parker and Fyfe reference numerous incidents involving GTF officers, which they conclude represent frequent acts of police misconduct, with the exception of these seventeen incidents summarized by Fyfe and three incidents summarized by Parker, neither Parker nor Fyfe identify the specific sources from which their conclusions are drawn. Parker and Fyfe's failure to specifically identify their sources precludes the court from testing their conclusions against the offense reports attached in Vol. III of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195). Two of the three incidents summarized by Parker are also summarized by Fyfe, and the third incident involved the search of a motor vehicle instead of a private residence. See Parker Affidavit at pp. 29–32.

**25.** Vol. III of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**26.** See Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 24 (Docket Entry No. 195) referencing Exhibits 3–8 attached in Vol. III of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**27.** *Id.*

**28.** Administrative Statement of D.R. Barrera, Document 26 attached in Vol. I of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**29.** *Id.* at pp. H000287–000288.

**30.** Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 25 (Docket Entry No. 195).

of the same incident,"[31] the incidents cited by plaintiffs "are generally in accordance with the Fourth Amendment,"[32] and that "even if the incidents cited were in violation of the Fourth Amendment, [their] small number is statistically insignificant."[33] In support of this argument the City asserts that

> [t]he Fourth Amendment does not impose a complete ban of warrantless searches, rather it limits the use of warrantless searches to those situations in which an officer has probable cause to conduct the search or situations in which exigent circumstances exist or consent is granted.[34]

The City argues that plaintiffs' offense reports evidence several instances in which GTF officers justifiably entered a residence without a warrant after smelling narcotics,[35] that the home entries involved misdemeanor charges,[36] and that "these relatively minor incidents do not bring the case to the level of scienter required to make a municipality liable under § 1983."[37]

### (c) Analysis

Warrantless searches inside a home are *per se* unreasonable, and therefore, unconstitutional, unless they fall into one of a few specifically established exceptions to the general rule. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 2042–2043, 29 L.Ed.2d 564 (1971); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). *See also United States v. Munoz–Guerra,* 788 F.2d 295 (5th Cir.1986). Consent and exigent circumstances are two well-settled exceptions to the Fourth Amendment's warrant requirement. *See United States v. Vega,* 221 F.3d 789, 798 (5th Cir.2000), *citing Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

Although Parker refers to 33 incidents involving warrantless entries into private residences, and Fyfe summarizes 17 incidents involving warrantless entries into private residences, neither Parker nor Fyfe attached copies of the relevant offense reports to their affidavits, and neither discusses the reasons—other than the fact that the entries were warrantless—why the offense reports are evidence of police misconduct that violates the Fourth Amendment. In response the City argues that the offense reports relied upon by Parker and Fyfe overlap and include several incidents in which GTF officers justifiably entered a residence without a warrant pursuant either to consent or exigent circumstances. However, like Parker and Fyfe, the City fails to discuss which offense reports overlap or which offense reports evidence police conduct that complies with the Fourth Amendment.

Using the Bates numbers referenced in Fyfe's affidavit, the court has prepared Table 2, which lists each of the warrantless entries of private residences summarized by Fyfe that is also represented by an offense report included in the summary judgment record. Table 2 identifies 13 incidents by Bates number, incident number, date, exhibit number in Vol. III of plaintiffs' exhibits, and description. The descriptions include how the incident began, the time it occurred, how it developed, and the arrests involved. Table 2 also identifies the exception to the warrant requirement on which the officers apparently

---

**31.** City of Houston's Motion for Summary Judgment at p. 12 (Docket Entry No. 180).

**32.** *Id.* at p. 28.

**33.** *Id.* at p. 29.

**34.** City of Houston's Reply to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 6 (Docket Entry No. 203).

**35.** City of Houston's Motion for Summary Judgment at p. 28 (Docket Entry No. 180).

**36.** *Id.* at p. 29.

**37.** *Id.* at p. 12.

relied to effect the entry and the officers' names. The court's review of these 13 offense reports reveals five entries based on consent, seven entries based on exigent circumstances, and one entry in which no Fourth Amendment interest appears to have been at issue.

Table 2

| Bates No. | Incident No. | Date | Ex. No. | Incident | | | | | Officers |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Start | Time | Description | No. Ar. | Exception | |
| 72977 | 133192597 | 10–18–97 | 2 | inv. stop | 21:25 21:30 | arrest urinating male, info. re drug party, smell dope thru door, evacuate apt, enter | 8 | exigent smell | Breedlove McDowell |
| 74259 | 007160898 | 1–16–98 | 3 | tip | 00:48 01:25 | drug tip, monitor area, knock on door, smell mj & cocaine, open door for officer safety, consent | 1 | consent | Harbison Crank |
| 74949 | 024604298 | 2–25–98 | 4 | call | 23:20 02:51 | loud noise & drug sales in apt, approach, chase suspect into apt, plain view cocaine, arrest | 1 | exigent pursuit | Harbison Crank |
| 74972 | 024623498 | 2–26–98 | 5 | call | 00:30 ? | loud noise, find non-residents in apt, trespass arrest, wake and search sleeper find cocaine | 1 | no 4th Amend. Interest | Harbison Herrada Crank |
| 26465 | 032203898 | 3–15–98 | 6 | call | 01:45 02:39 | drug-related disturbance, apt manager directs to apt, consent, crack in back room | 3 | consent | Harbison |
| 31760 | 038151198 | 3–28–98 | 7 | tr. stop | 01:05 04:15 | GTF make PI arrest, go to apt where arrestee bought crack, smell mj, enter apt | 3 | exigent smell | Barrera Esquivel Willis Strouse |
| 76978 | 067126598 | 5–28–98 | 8 | walk thru | 21:15 23:57 | juvenile seen, officer approached open door, smell mj, consent search of apt | 1 | consent | Barrera Tillery |
| 80297 | 029620499 | 3–6–99 | 9 | call | 18:12 23:42 | males smoking mj in car, 1 susp runs into house, officer enters, plain view mj in car | 2 | exigent pursuit | Marcus |
| 69851 | 055513597 | 5–2–97 | 12 | inv. stop | 00:15 03:11 | nervous pedestrian, smell mj, go to apt to check ID, smell mj, enter, mj and cocaine | 1 | exigent smell | McDowell Breedlove |
| 75881 | 041429198 | 4–3–98 | 13 | walk thru | 22:40 02.42 | smell mj, PI arrest on balcony, plain view crack pipe through apt | 2 | exigent pl. view | Harbison Hernandez |
| 72110 | 033462495 | 3–26–95 | 15 | tip | 00:08 01:45 | CI tells GTF stolen guns hidden in house, call DA, get landlady's consent, arrest tenant | 1 | consent | Siewart Esquivel |
| 28926 | 135436997 | 10–24–97 | 18 | ? | ? | car theft suspect gives up partner | 1 | consent | Esquivel Crank |
| 32273 | 019298198 | 2–13–98 | 19 | inv. stop | 22:45 02:48 | gang members drinking beer in parking lot, drop beer, run into apt, officers pursue into apt | 3 | exigent pursuit | Crank Herrada |

### (i) Consent Searches

■ Warrantless searches are not unreasonable under the Fourth Amendment if consent is given to conduct them. *Schneckloth*, 93 S.Ct. at 2047–2048; *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir.1997), *cert. denied*, 523 U.S. 1036, 118 S.Ct. 1335, 140 L.Ed.2d 495 (1998). When relying on the consensual search exception the government bears the burden of proving by a preponderance of the evidence that consent was given freely and voluntarily. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). *See also United States v. Ponce*, 8 F.3d 989, 997 (5th Cir. 1993). The voluntariness of a search is a question of fact to be determined from the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996), *citing Schneckloth*, 93 S.Ct. at 2047. *See also Tompkins*, 130 F.3d at 121, and *United States v. Morales*, 171 F.3d 978, 981 (5th Cir.1999). Relevant factors considered by courts in determining whether consent is given freely and voluntarily include:

(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Tompkins,* 130 F.3d at 121.

Five of the incidents listed in Table 2 describe searches apparently based on the consent exception to the warrant requirement.[38] Although plaintiffs have submitted each of these five offense reports as evidence of unconstitutional police action, the City does not argue that the consent obtained in any of these five situations was given freely and voluntarily. Instead, the City simply asserts that consent searches are permitted by the Fourth Amendment.[39] Because the Supreme Court has long held that warrantless searches of private residences are presumptively unconstitutional and that the government bears the burden of demonstrating otherwise, because the City fails to present any summary judgment evidence demonstrating that the consents obtained to enter and search private residences evidenced by the five offense reports summarized by Fyfe were given freely and voluntarily, and because the court must resolve factual controversies in favor of the nonmovant, the court concludes that the searches described in these five offense reports are presumptively improper.

(ii) Searches Based on Probable Cause and Exigent Circumstances

 Warrantless searches are not unreasonable under the Fourth Amendment if supported by probable cause and exigent circumstances. *Vega,* 221 F.3d at 798, *citing Steagald,* 101 S.Ct. at 1642.

*See also Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). Exigent circumstances "include those in which officers reasonably fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of evidence." *United States v. Rico,* 51 F.3d 495, 500 (5th Cir.), *cert. denied,* 516 U.S. 883, 116 S.Ct. 220, 133 L.Ed.2d 150 (1995). When relying on the exigent circumstances exception the government bears the burden of proving by a preponderance of the evidence the existence of both probable cause and exigent circumstances. *Morales,* 171 F.3d at 981–982. *See also Coolidge,* 91 S.Ct. at 2042 ("a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show ... the presence of 'exigent circumstances'"). In *Rico* the Fifth Circuit identified a non-exhaustive list of factors that may be considered in determining the existence of exigent circumstances, including

(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) information that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics traffic.

51 F.3d at 501, *citing United States v. Richard,* 994 F.2d 244, 248 (5th Cir.1993). *See also Vega,* 221 F.3d at 800; *Morales,* 171 F.3d at 982. In the Fifth Circuit "exigencies deliberately manufactured by the Government violate the Fourth Amendment, especially if the Govern-

---

**38.** See Exhibits 3, 6, 8, 15, and 18 attached in Vol. III of the Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**39.** City of Houston's Reply to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 6 (Docket Entry No. 203).

ment's actions are intentionally taken to avoid the warrant requirement." *United States v. Howard*, 106 F.3d 70, 78–79 (5th Cir.1997). To support warrantless entry of a residence, exigent circumstances must exist prior to the time the police approach a residence. *Vega*, 221 F.3d at 799–800.

■■■ Seven of the incidents listed in Table 2 describe searches apparently based on the exigent circumstances exception to the warrant requirement.[40] Three of these searches involved pursuit of fleeing suspects, three involved the smell of burning narcotics, and one involved the plain view of narcotics paraphernalia. Although plaintiffs have submitted each of these offense reports as evidence of unconstitutional police action, the City argues only that the smell of burning narcotics constitutes both the probable cause and exigent circumstances required to justify a warrantless entry and search of a private residence.[41] In support of this argument the City cites three Fifth Circuit cases: *United States v. McSween*, 53 F.3d 684, 686 (5th Cir.), *cert. denied*, 516 U.S. 874, 116 S.Ct. 199, 133 L.Ed.2d 133 (1995); *United States v. Reed*, 882 F.2d 147, 149 (5th Cir.1989); *United States v. Villarreal*, 565 F.2d 932, 937 (5th Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978), and one Eleventh Circuit case, *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir.), *cert. denied*, 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991).[42] The City also asserts that in *United States v. Grissett*, 925 F.2d 776, 778 (4th Cir.), *cert. denied sub nom. Perez–Rodriguez v. United States*, 500 U.S. 945, 111 S.Ct. 2245, 114 L.Ed.2d 486 (1991), the Fourth Circuit held that an officer's smell of burning narcotics constitutes "both ... probable cause *and* exigent circumstances" to

enter and search a residence without a warrant.[43]

The Fifth Circuit cases the City cites in support of its argument that the smell of burning narcotics constitutes probable cause are inapposite because each of them involves the search of an automobile, not the search of a private residence. *See McSween*, 53 F.3d at 686; *Reed*, 882 F.2d at 149; *Villarreal*, 565 F.2d at 937. The Supreme Court has long held that due to an automobile's mobile nature police officers have greater discretion to perform warrantless searches of automobiles than residences. *See Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). *See also Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) ("Our holding today is of course entirely consistent with the recognized principle that, assuming the existence of probable cause, automobiles and other vehicles may be searched without warrants 'where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.'"), *citing Carroll*, 45 S.Ct. at 285. The Eleventh Circuit case cited by the City did not base its finding of exigent circumstances on the smell of burning narcotics, but on the hurried actions and furtive looks of the defendants. *See Tobin*, 923 F.2d at 1511 (exigent circumstances present where "the agents could reasonably conclude from the defendants' hurried actions and furtive looks that [they] were either aware or afraid that someone was watching them [and] [d]estruction or removal of ... the narcotics was therefore a possibility"). The Fourth Circuit case cited by the City in support of its argument

---

40. See Exhibits 2, 4, 7, 9, 12–13, and 19 attached in Vol. III of the Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

41. City of Houston's Motion for Summary Judgment at pp. 12 and 28 (Docket Entry No. 180).

42. *Id.* at p. 28.

43. *Id.*

that the smell of burning narcotics constitutes both probable cause and exigent circumstances does not so hold. *See Grissett,* 925 F.2d at 778 (warrantless entry of hotel room justified both by the smell of burning marijuana and the exigent circumstances that developed after the officers identified themselves to the occupants of the hotel room which the officers had approached in order to identify a weapons offender).[44]

The City's arguments concerning an officer's ability to cite the smell of burning narcotics as justification for effecting a warrantless entry and search of a private residence are governed by two Supreme Court cases not cited by the City: *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), and *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). In *Johnson* police received a tip that opium was being used by unknown persons in a hotel room. 68 S.Ct. at 368. Arriving at the hotel to investigate, the police smelled the "distinctive and unmistakable" odor of burning opium coming from a certain room, knocked on the door, announced their presence, and asked for admittance. *Id.* A search of the room revealed opium and a smoking apparatus. *Id.* Reversing the occupant's conviction for possession of opium, the Court stated:

> At the time entry was demanded the officers were possessed of evidence which a magistrate might have found to be probable cause for issuing a search warrant.... If the presence of odors is

testified to before a magistrate and he finds the affiant qualified to know the odor, and it is one sufficiently distinctive to identify a forbidden substance, this Court has never held such a basis insufficient to justify issuance of a search warrant...

The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a

44. In *Grissett* police responded to a call informing them that there was an armed man in a motel lobby. Police arrived on the scene, located the man, and recovered the gun. The man could not produce identification, but he told the police officers that a friend in a motel room could identify him. Uniformed police officers knocked on the motel room door for the purpose of establishing the armed man's identity. Although they did not suspect the presence of drugs, the officers smelled marijuana while talking to the man at the motel room door. Fearing that the defendants would dispose of the drugs before officers could return with a warrant, the police entered and seized drugs that were in

plain view. The Fourth Circuit determined that the entry was justified because the officers reasonably concluded that evidence would likely be destroyed before a warrant could be obtained, thereby giving rise to exigent circumstances. The facts of *Grissett* are distinguishable from those evidenced in the offense reports at issue in the present case because the officers in these cases had information that drugs were being used in the apartments at the time they approached the apartments. See Exhibits 2, 4, 7, 9, and 12–13 attached in Vol. III of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

judicial officer, not by a policeman or Government enforcement agent. (citations omitted)

*Id.* The Supreme Court's ruling in *Johnson* establishes that an untested and uncorroborated tip coupled with the odor of burning narcotics does not by itself provide officers cause to enter and search a private residence without a warrant. *See also Taylor v. United States,* 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932) (odors alone do not authorize a search without a warrant).

In *Welsh v. Wisconsin* the Supreme Court held that the police violated the defendant's Fourth Amendment rights by arresting him in his home without a warrant for driving while intoxicated. The Supreme Court emphasized that "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." 466 U.S. 740, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). The Court noted that only "hot pursuit of a fleeing felon," "destruction of evidence," and "ongoing fire" had been recognized by the Court as emergency situations justifying a warrantless search or arrest and that only the "hot pursuit" doctrine had been applied to warrantless arrests effected in a suspect's home. 104 S.Ct. at 2097–98. In language that is particularly pertinent to the City's arguments, the *Welsh* Court stated:

> Our hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor. Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries. When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate.

104 S.Ct. at 2098 (citations omitted). The *Welsh* opinion explains the meaning of "minor offense" by reference to *Payton,* 100 S.Ct. at 1371, the case in which the Supreme Court prohibited warrantless arrests in the home without probable cause and exigent circumstances. *Id.* In *Payton* even the dissenters recognized the importance of limiting such arrests to felony offenses. *See* 100 S.Ct. at 1395 (White, J., joined by Burger, C.J., and Rehnquist, J., dissenting) ("The felony requirement guards against abusive or arbitrary enforcement and ensures that invasions of the home occur only in case of the most serious crimes.").[45]

Because in *Johnson* the Supreme Court held that the smell of burning opium will not support a warrantless entry into a private residence, because in *Welsh* the Supreme Court held that warrantless entries into private residences cannot be made to effect arrests for minor offenses, and because many of the arrests made by

---

**45.** In further amplification of the meaning of "minor offense" in this context, the *Welsh* opinion quotes with approval Justice Jackson's concurring opinion in *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 195–96, 93 L.Ed. 153 (1948), a case arising from a conviction for conducting an illegal numbers game:

> Whether there is reasonable necessity for a search without waiting to obtain a warrant certainly depends somewhat upon the gravity of the offense thought to be in progress as well as the hazards of the method of

attempting to reach it .... It is to me a shocking proposition that private homes, even quarters in a tenement, may be indiscriminately invaded at the discretion of any suspicious police officer engaged in following up offenses that involve no violence or threats of it .... When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant.

*Welsh,* 104 S.Ct. at 2098.

GTF officers pursuant to home entries based on the smell of burning marijuana are—as the City admits—for misdemeanor offenses,[46] the court is not persuaded by the City's argument that the smell of burning narcotics establishes both the probable cause and the exigent circumstances needed to justify the warrantless entry and search of a private residence. Because the Supreme Court has long held that warrantless searches of private residences are presumptively unconstitutional and that the government bears the burden of demonstrating otherwise, because the City fails to present summary judgment evidence demonstrating that the entries and searches evidenced by the seven offense reports summarized by Fyfe which appear to have been based on the exigent circumstances exception to the warrant requirement were supported by both probable cause and exigent circumstances, and because the court must resolve factual controversies in favor of the nonmovant, the court concludes that the searches described in these seven offense reports are presumptively improper.[47]

### (iii) Search Lacking A Fourth Amendment Interest

■ One of the incidents listed in Table 2 evidences an incident in which GTF officers responded to a loud noise complaint at an apartment and found the apartment occupied by trespassers.[48] Because trespassers have no expectation of privacy protected by the Fourth Amendment, the court is not persuaded that the warrantless entry and search of a private residence described in this offense report is presumptively improper. *See United States v. Garcilazo–Martinez*, 881 F.Supp. 265 (S.D.Tex.1994)(no legitimate expectation of privacy in abandoned house); *United States v. McRae*, 156 F.3d 708, 711 (6th Cir.1998)(no legitimate expectation of privacy in vacant house); *United States v. Dodds*, 946 F.2d 726 (10th Cir.1991) (no legitimate expectation of privacy in abandoned apartment); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 430–431, 58 L.Ed.2d

---

**46.** See City of Houston's Motion for Summary Judgment at p. 29 (Docket Entry No. 180) where the City asserts that the warrantless home entries cited by the plaintiffs "all involv[e] misdemeanor charges."

**47.** While the court is aware that there are reported cases from other jurisdictions holding that the smell of burning marijuana establishes exigent circumstances because the smell is itself proof that evidence of criminal conduct is being destroyed, none of them cites *Johnson*, 68 S.Ct. at 367, or *Welsh*, 114 S.Ct. at 2091. *See State v. Decker*, 119 Ariz. 195, 580 P.2d 333 (1978); *State v. Kosman*, 181 Ariz. 487, 892 P.2d 207 (1995); *Mendez v. People*, 986 P.2d 275 (Colo.1999), *cert. denied*, 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000); *People v. Baker*, 813 P.2d 331 (Colo.1991); *Joseph v. State*, 3 S.W.3d 627 (Tex.App.—Houston [14th Dist] 1999, no pet.). Cases from other jurisdictions which cite *Johnson* and *Welsh* hold that the smell of burning narcotics (marijuana) does not evidence an offense that is sufficiently grave to justify the entry and search of a private residence without a warrant. *See State v. Curl*, 125 Idaho 224, 869 P.2d 224 (1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1293, 127 L.Ed.2d 646 (1994); *Haley v. State*, 696 N.E.2d 98 (Ind.Ct.App.1998); *State v. Beeken*, 7 Neb.App. 438, 585 N.W.2d 865, 872 (1998); *State v. Wagoner*, 126 N.M. 9, 966 P.2d 176 (1998), *cert. denied*, 125 N.M. 654, 964 P.2d 818 (1998); *State v. Ackerman*, 499 N.W.2d 882 (N.D.1993); *State v. Robinson*, 103 Ohio App.3d 490, 659 N.E.2d 1292 (1995); *State v. Steelman*, 16 S.W.3d 483 (Tex.App.—Eastland 2000, petition for discretionary review granted Sept. 27, 2000), *State v. Ramirez*, 49 Wash. App. 814, 746 P.2d 344 (1987). Because the court concludes that *Johnson* and *Welsh* govern situations in which the smell of burning narcotics provide officers the only evidence that a crime is being committed, and because *Johnson* and *Welsh* were both decided long before the incidents documented in the offense reports submitted in opposition to the City's motion for summary judgment, the court is not persuaded by the City's assertion that the smell of burning narcotics constitutes both the probable cause and the exigent circumstances needed to conduct a constitutionally sound warrantless entry and search of a private residence.

**48.** Exhibit 5 attached in Vol. III of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

387 n.12 (1978) (suggesting that wrongful presence on property supports no reasonable expectation of privacy).

#### (iv) Court's Conclusions

The court's review of the summary judgment evidence establishes that the plaintiffs have produced evidence of eleven incidents that occurred before the shooting of Pedro Oregon Navarro in which GTF officers entered and searched private residences without a warrant in circumstances which, viewed in the light most favorable to plaintiffs, raise a presumption of unconstitutional police misconduct.[49] One of these incidents occurred in 1995,[50] three occurred in 1997,[51] and seven occurred in 1998 prior to the incident at the Navarro apartment.[52] The summary judgment evidence also shows that these eleven incidents resulted in 25 warrantless arrests. Because the warrantless entry of a private residence by police either to search or to arrest presumptively violates the Fourth Amendment, because the City fails to demonstrate that the entries, searches, and arrests evidenced by these eleven incidents are constitutionally sound, and because the court is not persuaded by the City's argument that the smell of burning narcotics provides officers both the probable cause and exigent circumstances needed to justify warrantless entry and search of a pri-

vate residence, the court concludes that plaintiffs have raised a genuine issue of material fact concerning whether the warrantless entries and searches evidenced in the summary judgment record represent a persistent, widespread practice of GTF officers which is so common and well settled as to constitute a custom that fairly represents municipal policy.[53]

#### 2. *Known to City's Official Policymaker*

 A policy or custom becomes official for purposes of § 1983 when it results from the decision or acquiescence of the municipal officer or body with "final policymaking authority" over the subject matter of the offending policy. *Gros*, 181 F.3d at 615. Plaintiffs offer no evidence that City policymakers had actual knowledge that GTF officers were conducting warrantless and unconstitutional searches of private residences, much less that City policymakers approved this policy.[54] Instead, citing *Webster*, 735 F.2d at 841, plaintiffs argue that "[t]his pattern of warrantless searches rises to the level of an official policy or custom."[55] In support of this argument, plaintiffs argue that six incidents of warrantless entries and searches conducted by GTF officers in 1998 show that "the pattern [of constitutional violations] became especially evident in the

---

**49.** Exhibits 2–4, 6–8, 12–13, 15, 18, and 19 attached in Vol. III of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**50.** Exhibit 15 attached in Vol. III of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**51.** Exhibits 2, 12, and 18 attached in Vol. III of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**52.** Exhibits 3–4, 6–8, 13, and 19 attached in Vol. III of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**53.** The court's conclusion should not be read to mean that a reasonable municipal policy-

maker reading these offense reports would have known that GTF officers were engaging in a pattern of unconstitutional police misconduct or that plaintiffs' expert witnesses have correctly characterized the police conduct at issue as "improper" or "egregious."

**54.** See Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 21 n. 3 (Docket Entry No. 195), where citing the dissent in *Bryan County*, 117 S.Ct. at 1401–1404, plaintiffs state that they "acknowledge that this Court is bound by the municipal liability rule of *Monell*, but they respectfully preserve a good-faith argument to change existing law and establish a rule of vicarious municipal liability."

**55.** *Id.* at p. 25.

months leading up to the Oregon shooting, when there was a marked escalation in the number of warrantless residential searches." [56] Plaintiffs also cite Parker, who testified that even a relatively small number of warrantless searches should place HPD on notice that the GTF was engaging in a pattern of unconstitutional conduct.[57] Finally, plaintiffs argue that

> [w]hen police conduct is especially egregious, as here, the burden of proof is less rigorous. "Where the violations are flagrant or severe, the fact finder will likely require a shorter pattern of the conduct to be satisfied that diligent governing body members would necessarily have learned of the objectionable practice and acceded to its continuation." ... Even a relatively small number of warrantless searches should place the HPD on notice that the GTF was engaging in a pattern of unconstitutional conduct.[58]

The Fifth Circuit has explained that in such cases,

> [c]onstructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Webster*, 735 F.2d at 841, *citing Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir.1984)(en banc), *reh'g denied*, 735 F.2d 861, 862 (5th Cir.1984)(en banc), *cert. denied*, 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). The City argues that the warrantless entries and searches of private residences cited by plaintiffs and their expert witnesses are too small in number and statistically insignificant to raise a genuine issue of material fact.[59]

There is no bright line rule for determining when a number of incidents taken together comprise a pattern of conduct serious enough to impute constructive knowledge to municipal policymakers. However, even assuming that the six 1998 incidents cited by plaintiffs evidence conduct that violated the Fourth Amendment, plaintiffs fail to show that these six warrantless entries and searches of private residences "were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity." *Bennett*, 728 F.2d at 768. Although plaintiffs present evidence that the responsibilities and procedures of the GTF were the subject of discussion within HPD,[60] and that the discussion included Kimbra Ogg, Director of the Mayor's Anti–Gang Office,[61] plaintiffs present no evidence that before the incident on July 11–12, 1998, that gave rise to this action warrantless entries and searches of private residences conducted by GTF officers was ever a topic of discussion within the HPD, the mayor's office, or the city council. Moreover, plaintiffs present no evidence that HPD policymakers read the specific offense reports summarized in Table 2, or that if HPD policymakers had read them they would have known that any unconstitutional acts had occurred. Without some notice of prior incidents, City policymakers cannot reasonably be

---

**56.** *Id.* at p. 24, citing Exhibits 3–8 attached in Vol. III of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**57.** *Id.* at p. 25, citing Parker Deposition at pp. 143–144, and Parker Affidavit at p. 36.

**58.** *Id.*, quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir.1984)(en banc), *reh'g denied*, 735 F.2d 861, 862 (5th Cir.1984)(en banc), *cert. denied*, 472 U.S. 1016, 105 S.Ct.

3476, 87 L.Ed.2d 612 (1985), and citing Parker Affidavit at p. 36.

**59.** City of Houston's Motion for Summary Judgment at p. 29 (Docket Entry No. 180).

**60.** Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at pp. 31–33 (Docket Entry No. 195).

**61.** *Id.* at pp. 32–33 and 36.

said to have shown deliberate indifference towards the GTF's misconduct.

Even though plaintiffs have presented evidence from which a reasonable trier of fact could conclude that the actions of certain GTF officers constituted a pattern of unconstitutional conduct, plaintiffs have failed to present evidence from which a reasonable trier of fact could conclude either that municipal policymakers knew about that pattern of unconstitutional misconduct or that the warrantless entries and searches were so numerous or flagrant that constructive knowledge of them should be imputed to municipal policymakers. *See Hamilton v. Rodgers*, 783 F.2d 1306, 1309 (5th Cir.), *opinion withdrawn on other grounds*, 791 F.2d 439 (5th Cir.1986)(holding that a dozen incidents of racial discrimination within a two-and-a-half-year period did not constitute a continual pattern of conduct sufficient to warrant the imputation of constructive knowledge to high ranking officers of the Houston Fire Department for purposes of imposing § 1983 liability). Accordingly, the court concludes that plaintiffs have failed to satisfy the second element necessary for a finding of municipal liability and that the City is entitled to summary judgment on plaintiffs' claim that the City maintained an unwritten policy of allowing GTF officers to conduct warrantless, unconstitutional searches of private residences.

**B. Failure to Provide Adequate Training and Supervision to the GTFs**

■ Plaintiffs allege that HPD provided inadequate training and supervision to its GTF officers, and that HPD's inadequate GTF training and supervision caused the warrantless entry and search of the Navarro apartment that resulted in the shooting death of Pedro Oregon Navarro in violation of the Due Process Clause of the Fourteenth Amendment.[62] Plaintiffs argue that the City's GTF training and supervision was inadequate because: (1) the City failed to provide GTF officers specialized narcotics training and written standard operating procedures and (2) the City failed to provide GTF officers adequate supervision.[63] The City argues that it is entitled to summary judgment on this issue because GTF training complies with and exceeds state-mandated training standards for Texas peace officers, which plaintiffs do not challenge as inadequate.[64]

■ Municipal liability for the failure to train or supervise police officers arises only when "the failure to train [or supervise] amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). To succeed on their failure to train and supervise claim, plaintiffs must show that

(1) the training or ... [supervising] procedures of the municipality's policymaker were inadequate, (2) the municipality's policymaker was deliberately indifferent in adopting the ... training [or supervising] policy, and (3) the inadequate ... training [or supervising] policy directly caused the plaintiffs' injury.

*Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir.2000), *quoting Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir.1996).

■ Plaintiffs may show that the training or supervising procedures of the City's policymaker were inadequate in two ways. First, plaintiffs can show that the City deliberately chose not to train or supervise its officers despite being on notice that its training and supervising regimen failed to prevent tortious conduct by its officers. *See Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir.2000), *citing Bryan County*, 117 S.Ct. at 1388. Second, under the "single incident exception," a single

---

**62.** *Id.* at pp. 20–21 and 28.

**63.** *Id.* at p. 28.

**64.** City of Houston's Motion for Summary Judgment at p. 22 (Docket Entry No. 180).

violation of federal rights may be sufficient to prove deliberate indifference. *Id.* The single incident exception requires proof that officers are placed in "recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training [or supervision]." *Id., citing Bryan County,* 117 S.Ct. at 1390. *See also City of Canton,* 109 S.Ct. at 1205 n. 10 (notice may be implied where failure to train officers or employees is so likely to result in a violation of constitutional rights that the need for training is plainly obvious). To establish deliberate indifference on a failure to train claim, actual or constructive knowledge of the inadequacy of the training program must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. *Cf. Webster,* 735 F.2d at 841. *See also Languirand v. Hayden,* 717 F.2d 220, 225 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984)(isolated instances of police misconduct are inadequate to prove knowledge and acquiescence).

1. *Failure to Provide Specialized Narcotics Training and Standard Operating Procedures*

Plaintiffs argue that the City failed to provide GTF officers specialized narcotics training and standard operating procedures defining the boundaries of their responsibilities. In support of this argument plaintiffs assert that the City had actual knowledge that GTF officers needed specialized narcotics training and standard operating procedures, that the City was aware of a pattern of misconduct that gave the City constructive notice that GTF officers needed specialized narcotics training and standard operating procedures, and that the City placed GTF officers in recurring situations that required specialized narcotics training and standard operating procedures.

(a) **Actual Knowledge**

▮ A municipality's actual knowledge of tortious misconduct by police officers may be shown by means such as discussions at council meetings or receipt of written information by city policymakers. *Bennett,* 728 F.2d at 768. Chief Bradford testified that the Chief of Police and his command staff of assistant chiefs serve as policymakers for HPD.[65] As evidence that the City had actual knowledge of the inadequacy of its training program for GTF officers, plaintiffs cite Bradford's deposition testimony, an interoffice memorandum written by HPD Lieutenant R.W. Robertson on January 13, 1995, the deposition testimony of Kimbra Ogg, Director of the Mayor's Anti–Gang Office, and the affidavit testimony of their expert witnesses, Fyfe and Parker.

Bradford testified that GTF officers did not receive written guidelines defining the scope of their responsibilities.[66] Robertson's memorandum, which was addressed to a sergeant, a lieutenant, and two captains, discussed a review to be undertaken by the patrol assistance chiefs and captains concerning GTF officers' need for standard operating procedures.[67] Ogg testified that she was concerned that GTF officers were not receiving adequate instruction on how to legally perform their job,[68] and that she had discussed her concern with HPD command staff on at least

65. Bradford Deposition at pp. 18–19 and 32.

66. Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 30 (Docket Entry No. 195), citing Bradford Deposition at pp. 149–150.

67. *Id.* at pp. 6 and 32, citing Interoffice Correspondence of R.W. Robertson, Document 11 attached in Vol. I of Exhibits to Plaintiffs'

Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

68. *Id.* at p. 32, citing Deposition of Kembra Kathryn Ogg at p. 48 attached in Vol. II of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

two occasions in 1997 when she urged HPD to change its policy and provide additional training to GTF officers.[69] Fyfe and Parker testified that "written guidelines and standard operating procedures are an important component of any training program because they educate officers about the boundaries of their authority."[70]

The court is not persuaded that plaintiffs' evidence establishes that City policymakers had actual knowledge that GTF officers' training was inadequate. Plaintiffs' evidence does not show that the City was on notice that its training regimen failed to prevent tortious misconduct by its GTF officers or that GTF officers are placed in recurring situations that present an obvious potential for violation of constitutional rights absent specialized narcotics training and standard operating procedures. *See Gabriel*, 202 F.3d at 745, *citing Bryan County*, 117 S.Ct. at 1388–1390; and *City of Canton*, 109 S.Ct. at 1205 n. 10.

While Bradford testified that GTF officers did not receive written guidelines, he also testified that

[t]he gang task force officers are primarily a uniform police force with a special assignment. We expect the officers to do what their basic training as a police officer would enable them to do. They do it in uniform services. They can enforce laws, including narcotics laws. We don't want them engaging in investigations. The objective was to increase the uniform presence of police officers on the streets of Houston, because we are getting complaints about gang activity on the streets of Houston. It was—it was to curtail criminal street gang activity. And a uniform officer being present, we know that it's less

likely that gangs are going to involve themselves in activity with a uniformed police officer being present.[71]

Bradford also testified that

every police officer is expected to enforce narcotics laws, particularly and especially in on-view situations. And many of the gang task officers were doing that and are—are doing that.[72]

Assistant Police Chief Joe L. Breshears testified that HPD has standard operating procedures for patrol officers, which GTF officers were expected to follow.[73] Like Bradford, plaintiffs describe GTF officers as "uniformed patrol officers assigned to regular patrol shifts who also worked overtime shifts with the GTF."[74] Plaintiffs make no showing that either the training or the standard operating procedures provided to patrol officers were inadequate for officers performing GTF duties. *See Canton*, 109 S.Ct. at 1206 (when assessing a claim for failure to train, courts must focus on the adequacy of the training program in relation to the tasks the particular officers must perform).

Robertson wrote in his memorandum that

the patrol assistance chiefs and captains have decided to review the need for Gang Task Force ... S[tandard] O[perating] P[rocedures]. Currently, the general consent is that this issue needs to be addressed and S[tandard] O[perating] P[rocedures] developed... Attached you will find preliminary surveys for the Gang Task Force ... The information contained within these initial surveys is very vague. One of the things that we are asking for, is a list of all tactics on initiatives your units are cur-

---

**69.** *Id.* at p. 33, citing Ogg Deposition at p. 39.

**70.** *Id.* at p. 30, citing Fyfe Affidavit at pp. 40–41 and Parker Affidavit at p. 8.

**71.** Bradford Deposition at pp. 149–150.

**72.** *Id.* at p. 74.

**73.** Deposition of Joe L. Breshears at p. 39 attached in Vol. II of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195)

**74.** Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 4 (Docket Entry No. 195).

rently involved in or would like to [be] involved in at some later date.[75]

Among the information to be addressed in the survey were responses to questions about the need for specialized training, a training manual, and standardized investigation procedures.[76] Roberston's memorandum demonstrates that in January of 1995 HPD was in the process of determining what types of recurring situations GTF officers faced and whether those situations required specialized training. It does not evidence either that GTF officers were engaging in tortious misconduct or that they were placed in recurring situations that required either specialized narcotics training or standard operating procedures that differed from those issued for patrol officers.

Ogg's testimony that she notified HPD command staff about her concern that GTF officers were not adequately trained is conclusory, lacking details of either the duties the GTF officers were expected to perform, the training GTF officers received, or the specific individuals to whom she expressed her concerns. Ogg's testimony does not contain evidence either that GTF officers were engaging in tortious misconduct due to inadequate training or that they were placed in recurring situations for which they were inadequately trained.

Fyfe and Parker testified that "written guidelines and standard operating procedures are an important component of any training program because they educate officers about the boundaries of their authority."[77] The City does not dispute this statement, but like Bradford's testimony, Robertson's memorandum, and Ogg's testimony, this expert testimony does not evidence either that GTF officers were engaging in tortious misconduct due to inadequate training or that GTF officers were placed in recurring situations for which they were inadequately trained.

Plaintiffs argue that "the key issue" in determining whether the City had actual knowledge of the need to provide GTF officers specialized narcotics training and standard operating procedures is "whether the City knew that GTF officers were conducting narcotics investigations."[78] Because plaintiffs have presented no summary judgment evidence showing that City policymakers had actual knowledge that GTF officers were expected to conduct narcotics investigations for which they needed specialized training or standard operating procedures that differed from those to which they were already subject as patrol officers, or that GTF officers were in fact conducting such narcotics investigations, or that City policymakers had actual knowledge that the City's training program failed to prevent its GTF officers from engaging in tortious conduct, the court concludes that plaintiffs have failed to raise a genuine issue of material fact for trial that City policymakers had actual knowledge that HPD's training regimen for GTF officers was inadequate because it failed to provide GTF officers specialized narcotics training and operating procedures.[79]

**(b) Constructive Knowledge**

 Constructive knowledge of tortious misconduct by police officers may be

---

**75.** Interoffice Correspondence of R.W. Robertson, Document 11 at p. 024153 attached in Vol. I of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**76.** *Id.* at p. H024154.

**77.** Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 30 (Docket Entry No. 195), citing Fyfe Affidavit at pp. 40–41 and Parker Affidavit at p. 8.

**78.** *Id.*

**79.** See *id.* at p. 21 n. 3, where plaintiffs tacitly admit their inability to show that the City had actual knowledge that GTF officers engaged in a pattern of misconduct by acknowledging "that this Court is bound by the municipal liability rule on *Monell*, but they [plaintiffs] respectfully preserve a good-faith argument to change existing law and establish a rule of vicarious municipal liability."

attributed to a municipality if plaintiffs show that the officers' underlying constitutional misconduct was so widespread or flagrant that in the proper exercise of its official responsibilities the city's governing body should have known of it. *See Bennett*, 728 F.2d at 768. *See also Webster*, 735 F.2d at 841.

As evidence that the City possessed constructive knowledge of the inadequacy of its GTF training program, plaintiffs cite an anonymous letter sent to former HPD Chief Sam Nuchia in January of 1995, a press release issued by Nuchia in April of 1996, and the affidavit testimony of their expert witness, Parker. Plaintiffs argue that the anonymous letter warned HPD about a "renegade band" of officers who had transformed their zero-tolerance assignment into a local undercover narcotics unit,[80] that the press release notified the public that narcotics investigations were "reserved for specially trained narcotics officers,"[81] and that Parker's affidavit demonstrates "a persistent and widespread pattern of misconduct in which the Southwest GTF conducted narcotics investigations."[82] Plaintiffs argue this evidence shows that GTF officers engaged in a pattern of misconduct that

> gave the City constructive notice that the GTF officers were conducting narcotics investigations—contrary to stated policy—and thus required either the specialized training given to narcotics officers or written guidelines expressly prohibiting them from engaging in narcotics investigations.[83]

Plaintiffs also argue that "[d]espite knowledge of these incidents, HPD took no serious action to restrain the tactical units from participating in narcotics investigations,"[84] that "in the absence of any real prohibition against conducting narcotics investigations the GTF officers continued to conduct narcotics searches,"[85] and that under these circumstances the failure to provide GTF officers either specialized narcotics training or standard operating procedures constitutes deliberate indifference to the rights of persons with whom the GTF officers come into contact.[86]

The Supreme Court has directed courts assessing a failure-to-train allegation to focus on the adequacy of the training program in relation to the tasks the particular officers must perform. *City of Canton*, 109 S.Ct. at 1206. *See also Conner*, 209 F.3d at 796–797; *Burge v. Parish of St. Tammany*, 187 F.3d 452, 472 (5th Cir. 1999). Plaintiffs make no showing that, in light of the duties assigned to GTF officers in 1998, the need for more or different training was obvious, and that this inadequacy was so likely to result in violations of constitutional rights that the City's policymakers can reasonably be said to have been deliberately indifferent to the need.

While the anonymous letter and the press release provide some evidence that in 1995 and 1996 tactical unit officers violated HPD policy, they are not evidence that the offending officers were engaging in tortious misconduct that violated the constitutional rights of citizens, or that the offending officers were placed in recurring situations for which they were inadequately trained. More importantly, this evidence shows that the offending officers failed to perform the duties to which they

---

**80.** *Id.* at p. 37, citing Interoffice Correspondence of C.A. Bullock, Document 4 at p. H14556 attached in Vol. I of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**81.** *Id.* at p. 37, citing News Release, Document 18 attached in Vol. I of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**82.** *Id.* at p. 39, citing Parker Affidavit at pp. 32–36.

**83.** *Id.* at pp. 36–37.

**84.** *Id.* at p. 37.

**85.** *Id.* at p. 39.

**86.** *Id.* at p. 41.

were assigned and that when their violations of HPD policy were discovered, "the specific guidelines ... [were] reiterated" to the offending officers in the Southwest Patrol Division who were the subject of the anonymous letter to Chief Nuchia[87] and that in the wake of this letter and similar problems in the Northeast Patrol Division Chief Nuchia issued a policy statement that specifically prohibited officers assigned to tactical units from engaging in narcotics investigations absent direct supervision of the Narcotics Division.

Nor does the affidavit testimony of Parker establish that officers assigned to the Southwest GTF in 1998 engaged in tortious misconduct that violated the constitutional rights of citizens, or faced recurring situations for which they were inadequately trained. Parker testified that he reviewed 428 offense reports involving narcotics offenses including 33 investigations involving residences or other occupied dwellings, that during the year immediately preceding the Pedro Oregon Navarro incident Southwest GTF officers conducted 14 narcotics investigations involving warrantless entries into private residences, and that this pattern continued during the year following the Pedro Oregon Navarro shooting.[88] Without identifying the specific sources or offense reports on which he relies, Parker concludes that GTF officers were "regularly initiating and conducting narcotics investigations."[89] Because Parker's affidavit fails either to identify the specific sources on which his conclusions are based or to demonstrate why specific investigations initiated or conducted by GTF officers violated constitutional rights, Parker's affidavit does not show that GTF officers frequently engaged in misconduct that violated citizen's constitutional rights. *See Clark,* 110 F.3d at 297 (unsupported affidavit testimony asserting conclusory facts and conclusions of law are not suffi-

cient to defeat a motion for summary judgment). *See also Boyd v. State Farm Insurance Companies,* 158 F.3d 326, 331 (5th Cir.1998)(expert affidavit submitted in opposition to motion for summary judgment "must include materials on which the expert based his opinion, as well as an indication of the reasoning process underlying the opinion").

### (c) Single Incident Exception

Under the "single incident exception" a single violation of federal rights may be sufficient to prove deliberate indifference. The single incident exception requires proof that officers are placed in "recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training." *Gabriel,* 202 F.3d at 745, *citing Bryan County,* 117 S.Ct. at 1390. *See also City of Canton,* 109 S.Ct. at 1205 n. 10 (notice may be implied where failure to train officers or employees is so likely to result in a violation of constitutional rights that the need for training is plainly obvious).

Plaintiffs argue that the City's deliberate indifference to the need to provide its GTF officers specialized narcotics training may be inferred from evidence that GTF officers were placed in recurring situations that presented an obvious potential for violation of constitutional rights and the need for additional or different police training. As evidence that the City had actual knowledge that GTF officers faced recurring situations that made the need for specialized narcotics training and standard operating procedures plainly obvious, plaintiffs assert that "HPD policymakers— including the Chief of Police, assistant chiefs, and members of the City Council— routinely ordered tactical units to conduct

87. Interoffice Correspondence of C.A. Bullock, Document 4 at p. H014555 attached in Vol. I of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

88. *Id.* at p. 39, citing Parker Affidavit at p. 34.

89. *Id.,* quoting Parker Affidavit at p. 35.

narcotics investigations." [90] In support of this assertion plaintiffs submit excerpts from the deposition testimony of Lieutenant Zamora, the immediate supervisor of the Southwest GTF; excerpts from the administrative statement made by officer Herrada following the Pedro Oregon Navarro incident; an interoffice correspondence to Chief Bradford from Lieutenant Walker of the Northeast Patrol Division; and excerpts from Parker's affidavit testimony. Plaintiffs also assert that the City was placed on constructive notice that GTF officers were conducting narcotics investigations for which specialized training and standard operating procedures were needed by daily and monthly reports compiled by HPD that included statistics concerning arrests for narcotics offenses effected by GTF officers.

Zamora testified that he repeatedly received memos from captain Bullock concerning complaints of drug-related activity in the Gulfton area, that one memo involved a report Bullock had received from the Chief of Police regarding complaints of drug activity in an apartment complex, that Bullock ordered Zamora to investigate the complaint, and that Zamora dispatched GTF officers to the scene.[91] Officer Herrada wrote in the administrative statement made following the Pedro Oregon Navarro incident that "we were ordered to this complex to conduct narcotics investigations on a zero-tolerance level." [92] Walker wrote in his interoffice correspondence that he did not understand the role of patrol division tactical units when assigned to respond to a narcotics complaint.[93] Parker testified that GTF offense

reports show that GTF officers conducted "walk throughs" of apartment complexes that invariably led to drug arrests and also created opportunities for GTF officers to enter and search apartments for evidence of narcotics violations.[94]

Plaintiffs argue that GTF officers were confused by the apparent contradiction between HPD's policy of restricting narcotics investigations to the Narcotics Division and HPD's practice of having GTF officers respond to narcotics complaints, that the confusion prompted by this contradiction placed the City on notice that the training provided to its GTF officers was inadequate, and that "[u]nder these circumstances, the need for additional training— or written guidelines clarifying the scope of GTF authority—can be said to be so obvious, that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." [95] *See City of Canton,* 109 S.Ct. at 1205 n. 10.

The court is not persuaded that plaintiffs' summary judgment evidence demonstrates that GTF officers faced recurring situations that made the need for specialized narcotics training and standard operating procedures plainly obvious or that the City's failure to provide GTF officers specialized narcotics training or standard operating procedures amounts to deliberate indifference to the rights of persons with whom the police come into contact. Plaintiffs acknowledge that "the GTF was composed of uniformed patrol officers assigned to regular patrol shifts who also

**90.** *Id.* at p. 34.

**91.** *Id.* at p. 14. See also Deposition of Harry Zamora at pp. 106–112 and Deposition of Charles A. Bullock at pp. 212–214 attached in Vol. II of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**92.** *Id.,* citing Document 27 at p. H000294 attached in Vol. I of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**93.** *Id.* at p. 18, citing Interoffice Correspondence of R. Walker, Document 14 at p. 038083 attached in Vol. I of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**94.** *Id.* at pp. 14–15 and 35. See also Parker Affidavit at pp. 34–35.

**95.** *Id.* at p. 36.

worked overtime shifts with the GTF." [96] Although plaintiffs assert that Zamora asked GTF officers to respond to a complaint about drug dealing at an apartment complex forwarded from the Chief's office, plaintiffs fail to show that the response to this complaint differed from responses to other complaints or calls for service to which patrol officers usually respond. Plaintiffs assert that Herrada wrote in his administrative statement that he and his fellow GTF officers were ordered into apartment complexes to conduct narcotics investigations on a zero-tolerance level, but fail to reference either their own description of HPD's zero-tolerance policy as a policing strategy in which areas of the City were "saturated by uniformed officers who enforce every law, without regard to the magnitude of the offense," [97] or their own recognition that "[o]fficers performing zero tolerance ... routinely made traffic stops and street-level arrests" [98] typically effected by patrol officers.

Plaintiffs cite Walker's interoffice correspondence as evidence that GTF officers were confused by the contradiction between HPD's stated policy prohibiting them from performing narcotics investigations and HPD's practice of having GTF officers respond to narcotics complaints. Plaintiffs fail, however, to acknowledge `

that Walker's correspondence demonstrates that neither he nor his GTF officers were confused about the actions the GTF officers were authorized to take when responding to narcotics complaints, but were instead merely dissatisfied with their inability to do more:

> We do work with the Narcotics Division Street Level Units when they are available and all drug complaints are reported to them for action. However, it seems patrol divisions are being held responsible for resolving these problems more each day. At most, patrol divisions can conduct surveillance to determine if the drug activity exists and then perform zero-tolerance and D[ifferential] R[esponse] T[eam] patrols in an attempt to address the problem. Usually, doing surveillance in a uniform, as required by the S[tandard] O[perating] P[rocedures], reveals very little and the patrol responses are a temporary fix at best. Arresting the drug dealers for the appropriate violation is the most effective response to drug complaints. However, given the current Department position relative to the Tactical Unit's involvement in drug complaints and investigations, we are limited in our efforts to resolve the problems.[99]

96. *Id.* at p. 4.

97. *Id.*

98. *Id.* at p. 22.

99. Interoffice Correspondence of R. Walker, Document 14 at p. H038084 attached in Vol. I of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195). See also Breshears Deposition at pp. 83–84 attached in Vol. II of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195), explaining that GTF officers were exasperated rather than confused about HPD's policy regarding their roles in narcotics investigations:

 [GTF officers] had been restricted, by policy, from involving themselves in narcotics investigations directly, so that [when] they

were then given complaints from citizens, "There's narcotics being sold at this location." Their question was, "What are we to do?" The answer was fairly simple. There are tactics that they can involve themselves in, -zero tolerance tactics, high-visibility tactics—that they can go out and apply in a patrol environment that don't require a narcotics investigation to solve these problems. So, it was just a matter of reexplaining to them that their main function was a patrol function, and if they go out there and did their job as patrol officers, which is what they were assigned to do,—gang task force units were a patrol operation-then, they would be successful in wiping out some of these problems. When they weren't successful, they were to coordinate with the narcotics division, and the narcotics division was to provide the kind of undercover investigations that are necessary to solve some of these problems.

Plaintiffs assert that their expert Parker reviewed 428 GTF offense reports involving narcotics offenses, including 33 investigations involving residences or other occupied dwellings, but fail to recognize that these offense reports documented approximately 237 investigations involving automobiles, approximately 224 investigations involving pedestrians,[100] or that Parker concluded the warrantless residential entries were made in violation of HPD's stated policy on narcotics investigations.[101] Plaintiffs assert that daily and weekly reports prepared for HPD command staff and federal authorities contain statistics compiled from arrests for narcotics offenses effected by GTF officers, but fail to demonstrate that these statistics show anything about the circumstances that led to the reported arrests, or the policing techniques used to effect them.

Plaintiffs' evidence merely establishes that GTF officers, like other patrol officers, can and do respond to narcotics-related complaints and that they can and do effect arrests for narcotics offenses that are either committed in their presence or discovered during the course of investigative stops. Plaintiffs' evidence does not establish that GTF officers are asked by their supervisors to initiate or undertake investigations that require use of undercover techniques, confidential informants, or search warrants for which specialized training is needed, or that GTF officers routinely conducted such investigations. On the contrary, plaintiffs' evidence establishes that GTF officers are not authorized to initiate or conduct such narcotics investigations absent supervision by the Narcotics Division, and that when GTF officers

do so, they act in violation of HPD's stated policy. The court therefore concludes that plaintiffs have failed to present summary judgment evidence from which a reasonable trier of fact could conclude that the City places GTF officers in recurring situations that require either specialized narcotics training or standard operating procedures that differ from those provided to patrol officers.

### 2. *Failure to Provide Adequate Supervision*

Plaintiffs argue that the City was deliberately indifferent to the lack of adequate supervision for the GTF because the City knew that narcotics investigations require specialized supervision, knew that GTF officers were conducting narcotics investigations, and yet failed to provide GTF officers with supervisors who had been specially trained on narcotics investigations, search and seizure procedures, the use of informants, and the use of force.[102] As evidence that the City failed to provide GTF officers adequate supervision, plaintiffs cite HPD Chief Bradford and Captain Bullock, both of whom testified that although HPD has a specialized Narcotics Division with specially trained officers and supervisors, the GTF units were supervised by the regular patrol divisions instead of by the Narcotics Division.[103] Plaintiffs cite the administrative statement of GTF Supervisor Sergeant Strouse that he knew "for a fact that [he] was never ordered not to conduct narcotics investigations" [104] and that he had not received any training in preparation for his GTF assignment.[105] Plaintiffs also

**100.** Parker Affidavit at p. 33.

**101.** *Id.* at p. 35, conclusions 1. and 4.

**102.** Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 45 (Docket Entry No. 195).

**103.** *Id.*

**104.** *Id.*, citing Interoffice Correspondence of D.H. Strouse, Document 31 at p. H00305

attached in Vol. I of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

**105.** *Id.* at pp. 5 and 45, citing Interoffice Correspondence of D.H. Strouse, Document 31 at pp. H00305–H00306 attached in Vol. I of Exhibits to Plaintiffs' Response to the City of Houston's Motion for Summary Judgment (Docket Entry No. 195).

cite HPD's failure to discipline Strouse for an incident that occurred before the incident at the Navarro apartment where Strouse supervised GTF officers as they initiated a traffic stop and used an arrestee to effect a warrantless entry into an alleged drug dealer's apartment.[106]

The court is not persuaded that plaintiffs' summary judgment evidence demonstrates that the City was deliberately indifferent to a lack of adequate supervision for the GTF. The summary judgment record establishes that GTF officers were patrol officers, and that like other patrol officers, GTF officers were directly supervised by a patrol sergeant.[107] The summary judgment record also establishes that GTF patrol sergeant Strouse was a Field Training Officer and a Field Training Evaluator who assessed policing skills and knowledge of probationary officers.[108] Moreover, plaintiffs fail to present any summary judgment evidence that HPD command staff knew about the incident for which plaintiffs assert Strouse should have been disciplined. The court concludes that plaintiffs have failed to present summary judgment evidence from which a reasonable trier of fact could conclude that the City was deliberately indifferent to the lack of adequate GTF supervision.

**C. Directing GTF Units to Conduct Law Enforcement Activities in a Racially Discriminatory Manner**

 Plaintiffs allege that HPD maintained a policy of directing GTF units to conduct law enforcement activities in a racially discriminatory manner by using the zero-tolerance strategy in the predominantly Hispanic Gulfton area, and that the execution of this policy directly caused the warrantless entry and search of the Navarro apartment and the shooting death of Pedro Oregon Navarro in violation of the Equal Protection Clause of the Fourteenth Amendment.[109] The City argues that it is entitled to summary judgment on this claim because plaintiffs cannot establish that HPD's use of the zero-tolerance strategy "was the moving force behind any constitutional violation based on race." [110]

*1. Legal Standard*

 The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *Rolf v. City of San Antonio,* 77 F.3d 823, 828 (5th Cir.1996), *citing City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)(laws aimed at mentally retarded do not create a "suspect classification"; but zoning restrictions on homes for mentally retarded persons are irrational since all asserted reasons for the restrictions apply equally to non-restricted group homes). Courts may conduct an equal protection inquiry only "if the challenged government action classifies or distinguishes between two or more relevant groups." *Rolf,* 77 F.3d at 828. The Equal Protection Clause prohibits selective enforcement of the law based on race. *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 1774–1775, 135 L.Ed.2d 89 (1996). Plaintiffs claiming unequal enforcement of facially neutral statutes or policies must show both that the enforcement had a discriminatory effect and that the enforcement was motivated by a discriminatory purpose. *See United States v. Armstrong,* 517 U.S. 456, 116 S.Ct. 1480, 1487, 134 L.Ed.2d 687 (1996).

---

**106.** *Id.* at p. 45.

**107.** Bradford Deposition at p. 171, Bullock Deposition at pp. 22–23, and Zamora Deposition at pp. 11–12.

**108.** Affidavit of Albert Rodriguez at p. 5, Exhibit M attached to City of Houston's Motion for Summary Judgment (Docket Entry No. 180).

**109.** *Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at pp. 1 and 52–53 (Docket Entry No. 195).*

**110.** City of Houston's Motion for Summary Judgment at p. 40 (Docket Entry No. 180).

*See also Home Depot, Inc. v. Guste*, 773 F.2d 616, 626 (5th Cir.1985). To establish discriminatory effect in a race case plaintiffs must show that people of another race violated the law and the law was not enforced against them. *Armstrong*, 116 S.Ct. at 1487; *Home Depot*, 773 F.2d at 626–627. To establish discriminatory purpose plaintiffs must show that the policymaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979); *Johnson v. Rodriguez*, 110 F.3d 299, 307 (5th Cir.), *cert. denied*, 522 U.S. 995, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997).

### 2. *The City's Evidence*

The City argues that it is entitled to summary judgment on plaintiffs' claim that GTF officers were directed to conduct law enforcement activities in a racially discriminatory manner because plaintiffs cannot establish that "HPD's use of zero tolerance as a police strategy amounts to a racially discriminatory custom, policy, or practice." [111] The City specifically argues that plaintiffs cannot show "facts to suggest that similarly situated anglos were treated differently," [112] or facts to suggest that "HPD's use of zero tolerance as a police strategy amounts to a racially discriminatory custom, policy, or practice because its purpose is to address all crime, impacting the group identified as criminals or suspected criminals rather than some suspect

classification of individuals." [113] The City argues that the traffic stop that set in motion the events that ultimately led to the death of Pedro Oregon Navarro was initiated against Nicholas Stutes and his passengers, all of whom are "anglo." [114]

### 3. *Plaintiffs' Evidence*

Plaintiffs argue that the City is not entitled to summary judgment on this claim because the City fails to establish conclusively that it did not violate the Equal Protection Clause. Plaintiffs submit excerpts from the deposition testimony of captain Bullock and Kimbra Ogg, former Director of the Mayor's Anti–Gang Office, as evidence that the City engaged in racial profiling to execute its zero-tolerance strategy. [115] Bullock testified that the zero-tolerance strategy was used in predominately minority communities, [116] that there are an estimated 60,000 immigrants of Hispanic heritage in the Gulfton area, [117] and that while implementing the zero-tolerance strategy in the Gulfton area, the City "saturated the ... area ... with officers." [118] Ogg testified that the City's zero-tolerance policy is based on "visual clues," which is a euphemism for racial profiling, [119] that the City's failure to provide written guidelines to GTF officers posed a risk that members of minority communities would be targeted based on their appearance, [120] and that the City's zero-tolerance policy caused racial or ethnic harassment. [121] Plaintiffs argue that the City's deliberate decision not to provide proper training, procedures, and policies for GTF officers operating in the pre-

**111.** *Id.*

**112.** *Id.* at pp. 38–39.

**113.** *Id.* at p. 40.

**114.** *Id.*

**115.** Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at pp. 53–54 (Docket Entry No. 195).

**116.** *Id.* at p. 53, citing Bullock Deposition at pp. 207–208, 233–234.

**117.** *Id.* at p. 52, citing Bullock Deposition at p. 168.

**118.** *Id.* at p. 53, citing Bullock Deposition at p. 170.

**119.** Ogg Deposition at pp. 32–33.

**120.** *Id.* at pp. 32 and 51.

**121.** *Id.* at pp. 35–36.

dominately Hispanic Gulfton area "proves that the City intended to discriminate against members of the Hispanic community."[122]

#### 4. *Analysis*

Plaintiffs do not contend that the zero-tolerance strategy or the laws enforced pursuant to it are facially discriminatory. Instead, the gravamen of plaintiffs' argument appears to be that the City discriminated against members of the Hispanic race by choosing to use the zero-tolerance strategy in the predominantly Hispanic Gulfton area.

#### (a) Discriminatory Effect

The parties to this action all agree that the zero-tolerance traffic stop underlying this action was initiated against non-Hispanics. Moreover, plaintiffs present no evidence that the City's implementation of the zero-tolerance policy in the Gulfton area was used to enforce the law against Hispanics but was not used to enforce the law against non-Hispanics. The court concludes that plaintiffs have failed to show that HPD's use of the zero-tolerance strategy had a discriminatory effect on Hispanics. *See Armstrong,* 116 S.Ct. at 1487; *Home Depot,* 773 F.2d at 626–627.[123]

#### (b) Discriminatory Purpose

Plaintiffs do not dispute the City's assertion that the zero tolerance policy was adopted and used in the Gulfton area to combat problems posed by drug dealing activities known to occur there. Moreover, plaintiffs fail to present any evidence demonstrating that the City used the zero-tolerance strategy only in the Gulfton area, that the City used the zero-tolerance strategy only in predominantly Hispanic areas,

or that the City used the zero-tolerance strategy for the purpose of discriminating against Hispanics.

Because plaintiffs present no evidence that the City's use of the zero-tolerance strategy in the Gulfton area had a discriminatory effect on Hispanics and no evidence that the City used the zero-tolerance policy in the Gulfton area for the purpose of discriminating against Hispanics, the court concludes that the City is entitled to summary judgment on plaintiffs' claim that the City denied Hispanic residents of the Gulfton area equal protection of the laws.

### V. *Conclusions and Order*

Plaintiffs argue that the shooting death of Pedro Oregon Navarro was not a random, isolated event, but was "the inevitable culmination of an unwritten policy and custom that has developed in the Houston Police Department (HPD) over the last decade."[124] In support of this argument, plaintiffs present evidence which they argue shows that the HPD adopted an unwritten custom of allowing GTF officers to conduct unconstitutional, warrantless searches of private residences in violation of the Fourth Amendment; that the City was deliberately indifferent to the risk that the Southwest GTF officers were inadequately trained and supervised in violation of the Due Process Clause of the Fourteenth Amendment; and that the City directed GTF officers to enforce the laws in a racially discriminatory manner in violation of the Equal Protection Clause of the Fourteenth Amendment. After carefully reviewing the summary judgment record, the court concludes that plaintiffs have failed to present competent summary judgment evidence from which a reasonable trier of fact could conclude that the City had an official policy of allowing GTF

---

**122.** Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 54 (Docket Entry No. 195).

**123.** See Ogg Deposition at p. 51 where Ogg stated:

> The risk to the members of the community is that they can be focused on unfairly, based upon appearance. I want to clarify

that I don't—I'm not about to speculate that was the intent of zero tolerance. I think it was one of the practical problems associated with it.

**124.** Plaintiffs' Response to the City of Houston's Motion for Summary Judgment at p. 2 (Docket Entry No. 195).

officers to conduct unconstitutional searches of private residences in violation of the Fourth Amendment, that the City had an official policy of providing inadequate training or supervision to the GTFs, or that the City had an official policy of directing GTF officers to conduct law enforcement activities in a racially discriminatory manner. Accordingly, the court concludes that the City is entitled to summary judgment on plaintiffs' claim that the City violated the civil rights of Pedro Oregon Navarro. The City of Houston's Motion for Summary Judgment (Docket Entry No. 180) is GRANTED.[125]

---

125. The live claims remaining in this case are those claims asserted by the estate of Pedro Oregon Navarro against HPD officers Barrera and Herrada for excessive use of force and wrongful death brought pursuant to 42 U.S.C. § 1983, and the Texas Wrongful Death Statute, Tex. Civ. Prac. & Rem.Code §§ 71.001 *et seq.;* against all the individual HPD officer defendants for conspiracy and wrongful entry and search brought pursuant to 42 U.S.C. § 1983; against Sergeant Strouse for failure to supervise brought pursuant to 42 U.S.C. § 1983; and the crossclaims asserted by the individual officers against the City and by the City against the individual officers. Although ¶ 57 of Plaintiffs' Second Amended Complaint (Docket Entry No. 76) suggests that the estate of Pedro Oregon Navarro has also asserted a claim pursuant to the Texas Wrongful Death Act against the City of Houston, the table of claims attached as an appendix to Plaintiffs' Second Amended Complaint (Docket Entry No. 76) shows that the estate has asserted claims pursuant to the Texas Wrongful Death Statute only against officers Barrera and Herrada.

The parties fully briefed the issues addressed in this Opinion and Order, and the court has expended considerable time reading these papers and performing independent research in order to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented the court may not have expressly addressed each and every argument presented by the parties, the parties should assume that failure to expressly address a particular argument in this Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.